# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

2:16-cr-139-6
**ELECTRONICALLY FILED**

WILLIAM RICHARDSON,

Defendant.

## OPINION

**Mark R. Hornak, United States District Judge**

Defendant William Richardson, through counsel, has filed a series of pretrial motions. (ECF Nos. 511, 513, 515, 516, 517, 531, 539, 544.) Defendant has also filed a number of *pro se* motions. (ECF Nos. 556, 557, 558, 559, 560, 588.) Counsel has advised that Defendant's Motion for 404(b) Evidence (ECF No. 513), and Defendant's Motion for Early Disclosure of *Jencks* Material (ECF No. 516) have been addressed by the Court's pretrial order at ECF No. 577. Additionally, Counsel advises that Defendant's Pro-Se Motion for Return of Property (ECF No. 558) was addressed by the Court's February 16, 2017 Order Denying Motion for Return of Personal Property. (ECF No. 208.) As such, these motions—ECF Nos. 513, 516, and 558—will be denied as moot.

Counsel has advised that the Court need not take any further action on Defendant's Motion for Disclosure of Prior Testimony and Contact Information (ECF No. 515) at this time. Counsel also noted that the Appeal of Detention Order (ECF No. 531) had been withdrawn, but that Defendant intended to advance a *pro se* Motion for Bond. These motions will be denied without prejudice.

That leaves for the Court's consideration the following counseled motions: Motion to Suppress Wiretaps (ECF No. 517), Motion for Disclosure of *Brady* Materials (ECF No. 511),

1

Motion to Compel Specific Disclosure of Rule 16 Material (ECF No. 539), and Motion for Bill of Particulars as to Drug Quantity (ECF No. 544). In addition, before the Court are Defendant's *pro se* motions: Pro-Se Motion to Suppress Evidence Seized from Residence (ECF No. 560), Pro-Se Supplement to Motion to Suppress Wiretap [ECF No.] 517 (ECF No. 556), and Pro-Se Supplement to Appeal of Detention Order [ECF No.] 531 (ECF No. 557).

The Government opposes these motions. (Gov't Omnibus Response to Pretrial Motions, ECF No. 584 ("ECF No. 584").) The motions are fully briefed, oral argument was held on August 8, 2018,[1] and the matter is ripe for disposition.

For the reasons that follow, Defendant's Motions will be denied.

## I. Background

Defendant William Richardson is charged in a multi-count indictment with conspiracy, healthcare fraud, and possession with intent to distribute the controlled substances oxycodone and oxymorphone. (Superseding Indictment, ECF No. 112.) He is also charged with possessing or using firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A)(i). (*Id.*) The basis for the federal investigation was an authorized Title III intercept of telephone conversations between Richardson and Antoinette Adair which tended to indicate that they were involved in a conspiracy to distribute prescription narcotics. (Motion to Suppress Wiretaps, ECF No. 517 ("ECF No. 517"), ¶ 1.)

## II. Analysis

Before the Court are Defendant's counseled Motion to Suppress Wiretaps (ECF No. 517), Motion for Disclosure of *Brady* Materials (ECF No. 511), and Motion for Bill of Particulars as to

---

[1] The Court granted Defendant's Pro-Se Motion for *Peppers* Colloquy (ECF No. 559) and permitted Defendant to present some of his motions *pro se* at the August 8, 2018 Motions Hearing. (ECF No. 589.)

Drug Quantity (ECF No. 544). In addition, before the Court are Defendant's *pro se* motions: Defendant's Pro-Se Motion to Suppress Results of Search of Residence (ECF No. 560), Pro-se Supplement to Motion to Suppress Wiretap [ECF No.] 517 (ECF No. 556), and Pro-se Supplement to Appeal of Detention Order [ECF No.] 531 (ECF No. 557). There is some overlap among the *pro se* and counseled motions, and the Court will endeavor to clarify which arguments Richardson advances through counsel and which he advances *pro se*.

### A. Motion for Disclosure of *Brady* Materials

Defendant has filed a counseled motion for Disclosure of *Brady* Materials, in which he seeks: (1) evidence tending to indicate that defendant is not guilty of the charged offenses; and (2) material impeachment evidence as to the Government's witnesses. (Motion for Disclosure of *Brady* Materials, ECF No. 511.) The Government indicates it will produce the majority of the information Defendant seeks (if it exists) at the time that the Government discloses the Jencks Act materials pursuant to 18 U.S.C. § 3500. To the extent that the Motion seeks early disclosure of these materials and to the extent that it seeks disclosure of materials the Government is not obligated to provide, the Motion will be denied.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government must disclose "evidence favorable to the accused upon request . . . where the evidence is material either to guilt or to punishment." *Id.* at 87. Even if the defendant has not specifically requested exculpatory material, the government has a duty to volunteer evidence "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed." *United States v. Agurs*, 427 U.S. 97, 110 (1976). Evidence which will be used to impeach the testimony of a government witness must be disclosed under *Brady* when a witness's credibility may have an effect on the jury's determination of the defendant's guilt or innocence. *See United States v. Hill*, 976 F.2d 132, 134–

35 (3d Cir. 1992). If the exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it is "material." *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir. 1984). "Only if the exculpatory evidence meets the appropriate test of materiality does the due process clause impose upon the prosecutor the duty to disclose that information to a defendant." *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983).

As to the timing of disclosures, the government's *Brady* obligations require it to disclose actual exculpatory evidence without undue delay, "in time for its effective use at trial." *Id.* The Third Circuit has a "longstanding policy of encouraging early production" of such evidence. *Starusko*, 729 F.2d at 261. By contrast, the Jencks Act requires the government to provide the defense with statements of witnesses that it intends to call at trial, but does not require such disclosure "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). The Third Circuit has held that evidence related to government witness credibility that is *not* material may be disclosed "the day that the witness testifies" without harming a defendant's due process rights. *Higgs*, 713 F.3d at 44.

Here, Defendant is entitled to the discovery he seeks to the extent it falls within the purview of *Brady* and/or the Jencks Act. The Government has stated that it will voluntarily turn over this material "well in advance of trial to ensure that unnecessary interruptions or delays are avoided." (ECF No. 584, at 24). The Government has also declared its intention to provide the majority of impeachment information requested at the same time that it discloses the Jencks Act materials. (*Id.*) But to the extent that Defendant's Motion can be interpreted to request that the Court order early disclosure of evidence that is not material and goes only to impeachment of witnesses, such a request is foreclosed by Third Circuit caselaw. *See Higgs*, 713 F.2d at 45 ("[I]t was an abuse of discretion for the trial court to order disclosure a week prior to trial" when "[t]he information

4

ordered disclosed . . . was provided solely to help them in cross-examining the government's witnesses at trial, not to assist them in a general pretrial investigation."). Of course, the Government is required to turn over any material *Brady* information (beyond impeachment information) immediately and without undue delay.

Defendant has also made several requests that fall outside of the Government's obligations to disclose under *Brady* and the Jencks Act. To that end, the Court concludes that Defendant is not entitled to the following information: (1) information on non-testifying confidential informants; (2) witnesses' military records, when those military records do not provide exculpatory information; (3) assessments made by law enforcement or counsel for the government concerning witnesses' lack of credibility or reliability, unless such assessments contain otherwise undisclosed underlying exculpatory facts, *see Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006); *cf. United States v. Donahue*, 460 F. App'x 141, 144 (3d Cir. 2012) (declining to find a *Brady* violation when the prosecutor did not disclose his belief that FBI agent committed perjury, when the information would not have changed the outcome of the case).[2]

## B. Motion to Suppress Fruits of 2014 and 2016 Search Warrants

Proceeding *pro se*, Defendant seeks to suppress prescription opioid pills and six firearms seized by Pittsburgh Police during an August 15, 2014 search of his residence at 1355 Geyer Avenue pursuant to an Allegheny County search warrant. (ECF No. 560). He also challenges a 2016 search of his residence pursuant to a federal search warrant, averring that it improperly relied on the same purported falsities as the 2014 affidavit. (*Id.*) Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to pursue his claims that undercover purchases of prescription opioids at the house never occurred, that the affidavit in support of the 2014 search

---

[2] The Government has also assured the Court that the underlying facts supporting any reasons for an opinion as to the credibility of a witness will be disclosed to Defendant. (ECF No. 584, at 26.)

warrant was fabricated, and that the affidavit in support of the 2016 search warrant was similarly infirm. For the following reasons, the Court concludes that Defendant is not entitled to a *Franks* hearing as to either search warrant.

A *Franks* hearing to challenge a search warrant affidavit may only be granted if a defendant makes a "substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. "If the defendant makes the requisite substantial showing for a *Franks* hearing and then, at that hearing, shows by a preponderance of the evidence that material statements in the affidavit are either recklessly or intentionally untruthful, the fruits of the search must be excluded unless the remaining content of the warrant is sufficient to establish probable cause." *United States v. Brown*, 3 F.3d 673, 676 (3d Cir. 1993). Put differently, even if the affiant made a false statement, the statement must be necessary to a finding of probable cause in order for a hearing to occur and evidence to be suppressed. *See United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006). Moreover, "[a]llegations of negligence or innocent mistake are insufficient," *Franks*, 438 U.S. at 171, and the law does not require "elaborate specificity . . . in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

### 1. Is Defendant entitled to a *Franks* hearing as to the 2014 warrant?

Here, Defendant avers that the affidavit in support of the 2014 Allegheny County search warrant contains two types of falsities. First, he argues that the affiants falsely identified him as the owner of 1335 Geyer Avenue, despite their knowledge that his name did not appear in the ownership and tax records available online through Allegheny County. (ECF No. 560, at 2–3.) Second, he alleges that the affiants lied about texting and calling him to arrange the three

6

undercover buys on which the affidavit relied. (*Id.*) In particular, he proffers prior state-court testimony by Pittsburgh Detective Justin Simoni, who was involved in all three undercover buys. (Transcript of Preliminary Hearing, *Commonwealth v. Richardson*, No. 687254–1, Feb. 5, 2015, ECF No. 584–6 ("ECF No. 584–6").) Defendant interprets this testimony as conceding that the calls and texts never occurred, and therefore the corresponding undercover buys never took place. (ECF No. 560, at 21.)

Turning to Defendant's first argument, the Court finds that the affidavit's cover sheet identifies him as the property's "owner, occupant, or possessor," and the supporting affidavit refers to 1335 Geyer Avenue as his "residence" because Defendant "lists 1335 Geyer Avenue as his residence on his Pennsylvania driver's license." (Allegheny County Application for Search Warrant and Authorization, August 14, 2014, ECF No. 584–1 ("ECF No. 584–1"), at 1–2). Defendant's argument that 1335 Geyer Avenue was indeed his home, but that police did not *know* it was his home, thus fails. Additionally, "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of a crime will be found." *United State v. Tehfe*, 722 F.2d 1144, 1117 (3d Cir. 1983). The three undercover buys, not whether Defendant owned the property, are what provided probable cause to believe that evidence of a crime would be found. No *Franks* hearing is required on this basis.

As to Defendant's second argument, that detectives fabricated calls and text messages to arrange the buys, the Court has not identified a false statement material to the finding of probable cause such that a *Franks* hearing is required. Defendant avers that law enforcement fabricated their calls and texts to him and that there was no controlled buy on August 14, 2014. (ECF No. 560, at 24.) These conclusory statements are unsupported by the "affidavits or sworn or otherwise reliable statements of witnesses" that *Franks* requires to obtain a hearing. 438 U.S. at 171. Bare allegations

7

that police lied are not enough. Rather, "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

Nor, for that matter, does Detective Simoni's state-court testimony establish a material falsehood. Simoni described the August 14, 2014 undercover buy in detail in his testimony, which matches his affidavit. (ECF No. 584–6, at 13–25.) He attested that Detective Ladner handled communications for the first buy and that he handled them for the second two. All three buys resulted from communications between Detective Ladner's undercover phone and a phone number believed to belong to Defendant. (ECF No. 584–1, at 2; ECF No. 584–6, at 12.) Defendant makes much of Detective Simoni's acknowledgement in his state-court testimony that, based on text messages alone, he could not be positive who he was communicating with. (*See* ECF No. 584–6, at 14, 16.) The Court is not persuaded that this rises to a material falsehood. Simoni's belief that he was communicating with Defendant was confirmed when he bought drugs from Defendant. (*See id.* at 8–9.)

The only other inconsistency that the Court has identified respecting Simoni's state-court testimony is similarly immaterial. In his testimony, Simoni said that he could not be certain whether "actual phone communications were made" by Detective Ladner to Defendant in connection with the August 6, 2014 undercover buy. (*Id.* at 11.) The affidavit, however, stated that Detective Ladner had verbal as well as text communications with Defendant on that date. (ECF No. 584–1, at 2.) Again, this inconsistency appears to the Court to reflect the type of "negligence or innocent mistake" that does not warrant a *Franks* hearing. *Franks*, 438 U.S. at 171.

Additionally, Detective Ladner testified at the August 8, 2018 Motions Hearing, and was subject to cross-examination by Defendant, proceeding *pro se*. The substance of her testimony

8

was that she made all of the communications related to the first (August 6, 2014) buy, that she spoke on the phone to a male individual she believed to be Defendant, and that her phone conversations with the individual were consistent with her text message communications with the same individual at the same telephone number. She also stated that she had received credible information from a confidential informant that the individual communicating from that phone number was Defendant.

What is more, even if law enforcement *had* fabricated all of the communications exchanged, "there remains sufficient content in the affidavit in the affidavit to support a finding of probable cause." *See id.* at 172. The affidavit described Simoni's purchase of "2 Pans" directly from Defendant at 1335 Geyer Avenue, and Simoni's plain view of "numerous pill bottles, orange colored [Opanas] scattered around the table, sandwich baggies, and numerous other unknown white pills" while in the house. (ECF No. 584–1, at 4.) The affidavit also noted the smell of marijuana and the high traffic in and out of the house established by subsequent surveillance. (*Id.*)

### 2. Is Defendant entitled to a *Franks* hearing as to the 2016 warrant?

Relatedly, Defendant challenges a 2016 search of his residence, conducted pursuant to a federal search warrant, on the grounds that the 2016 warrant relied on the supposedly false allegations on which the 2014 state warrant also relied. (ECF No. 560, at 6.) As demonstrated above, the 2014 search warrant does not suffer from the infirmities Defendant claims. And even if it did, Richardson has not advanced any evidence that the affiant, FBI Special Agent Werner ("SA Werner") had actual knowledge of a falsity in the 2014 warrant. Moreover, the Affidavit in Support of the 2016 Warrant, ECF No. 584–5 ("ECF No. 584–5") refers to the 2014 undercover buys (ECF No. 584–5, at 15–17), but relies primarily on evidence obtained from other sources, such as confidential informants, pole camera footage, and authorized interception of Defendant's phone

9

communications with Antoinette Adair, to support its probable cause showing. (*Id.* at 25, 17–26.) Defendant reproaches Werner for including details of the 2014 undercover buys and search although he "had no personal knowledge" of those events. (ECF No. 560 at 7.) However, "an affidavit 'need not reflect the direct personal observations of the affiant.'" *United States v. Pearson*, 181 F. App'x 192, 195 (3d Cir. 2006) (quoting *Aguilar v. Texas*, 378 U.S. 108, 114 (1964)). Nor did Werner represent in the affidavit that he had personal knowledge of the 2014 buys.

In short, Defendant has not identified actually material misstatements or omissions, nor has he offered sufficient accompanying proof to meet the preliminary showing entitling him to a *Franks* hearing as to either the 2014 or the 2016 search warrant. Therefore, his Motion at ECF No. 560 will be denied.

## C. Motion for Specific Disclosure of Rule 16 Material

Defendant presents a counseled Motion for Specific Disclosure of Rule 16 Material (ECF No. 359), in which he requests that the Court direct the Government to provide a detailed list of the intercepted calls and text messages as well as an indication of the portions of the pole camera video the Government intends to introduce at trial. Since this motion was filed, the Government has provided the defense with a detailed spreadsheet of the requested information. The Government also averred at the August 8, 2018 Motions Hearing that it would provide a hard disk of all video snippets on or before August 20, 2018. The Government has further indicated that if it identifies more calls to be used, it will advise Defendant of that before trial. The Court will therefore deny the Motion at ECF No. 359 as moot.

## D. Motion for Bill of Particulars as to Drug Quantity

Defendant presents a counseled motion under Federal Rule of Criminal Procedure 7(f) for a bill of particulars. (Motion for Bill of Particulars as to Drug Quantity, ECF No. 544 ("ECF No. 544").) A bill of particulars provides a criminal defendant a "formal, detailed statement of the claims or charges brought." *Black's Law Dictionary* 184 (9th ed. 2009). Whether to grant a motion for a bill of particulars is within the discretion of the trial court. *United States v. Addonizio,* 451 F.2d 49, 64 (3d Cir. 1971). A bill of particulars is appropriate when "an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa,* 891 F.2d 1063, 1066 (3d Cir. 1989). It "is not to be used by the defendant as a discovery tool." *United States v. Fischbach & Moore, Inc.,* 576 F. Supp. 1384, 1389 (W.D. Pa. 1983). This Court must take into account "numerous countervailing considerations," including "the unfairness that can result from forcing the government to commit itself to a specific version of facts before it is in a position to do so." *Rosa*, 891 F.2d at 1066. Moreover, "the court may consider not only the indictment, but also all the information that has been made available to the defendant." *Fischbach,* 576 F. Supp. at 1389. The need for a bill of particulars is less apparent in cases where the Government provides substantial discovery. *United States v. Urban,* 404 F.3d 754, 772 (3d Cir. 2005).

Here, Defendant has made several requests of the government for discovery as to the quantity of drugs with which he is charged. (ECF No. 544, ¶ 2.) In response, the Government provided Defendant with a fifty-five (55) page list of calls related to Defendant's alleged drug trafficking. (ECF No. 544, ¶ 3.) Defendant avers that case agents told him that determining the pill quantity through the list would be a waste of time and inaccurate in any event. (*Id.*) The agents also told him the Government had prepared a spreadsheet of transactions and estimated pill

11

quantities, but the Government declined to provide the spreadsheet or related information. (*Id.*) Defendant claims that the volume of calls, texts, and transactions captured via pole camera would be "impossible" to review in order to compile what the Government already has and expects to present at trial or sentencing. (*Id.* ¶ 7.) The crux of Defendant's motion is thus that the Government's disclosures have been too voluminous.

In exercising its discretion, the Court concludes that a bill of particulars is not warranted. The Court recognizes the difficulty that Counsel, as the fifth court-appointed attorney to represent Richardson, faces in preparing for trial. But Counsel has not identified a way that the government's failure to provide its compilation of drug quantity "significantly impairs [his] ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *Rosa*, 891 F.2d at 1066. Although the Superseding Indictment does not describe a specific quantity of pills, the Government has produced affidavits detailing the evidence gathered by investigating agents, line sheets summarizing pertinent intercepts, and recordings of the intercepted phone calls. A bill of particulars "is not intended to provide the defendant with the fruits of the government's investigation," but rather "it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985).

Additionally, this Court has found no caselaw to support the notion that a bill of particulars is required when, as here, the indictment does not list a drug quantity and drug quantity is not an element of any charged offense. *Compare* 21 U.S.C. § 841(a) (criminalizing the possession with intent to distribute a controlled substance, without reference to amount), *with id.* § 841(b) (referring to quantities of controlled substances in the "penalties" section). The drug quantity will certainly be relevant at sentencing, but a bill of particulars is not designed to avoid prejudicial surprise at

12

sentencing. *See Rosa*, 891 F.2d at 1066. Rather, Federal Rule of Criminal Procedure 32, requiring that the defendant be made aware of the evidence to be considered and potentially used against him at sentencing, will protect Defendant's due process rights at that juncture, if it arises. Defendant's Motion at ECF No. 544 will be denied.

### E. Motion to Suppress Wiretaps

Defendant has advanced counseled and *pro se* motions to suppress wiretaps. (ECF Nos. 517 & 556.) Proceeding *pro se*, he also submitted a Memorandum of Facts and Conclusions and Law, ECF No. 616–1 ("ECF No. 616–1") in further support of his supplemental motion at ECF No. 556.[3]

In February 2016, SA Werner received authorization to intercept communications to and from Antoinette Adair's telephone. (*See* Affidavit in Support of Application of the United States of America for an Order Authorizing the Interception of Wire and Electronic Communications to and from Cellular Telephone Number (412) 528-4839 and to and from Cellular Telephone Number (412) 944-0249, Misc. No. 16-191A, ECF No. 517–1 ("ECF No. 517–1"), at 14.) Many of these communications involved Richardson. (*See id.* at 21–22.) A month later, Werner sought and obtained authorization to continue intercepting Adair's communications and begin intercepting Richardson's communications. (*Id.* at 17, 47.) Defendant contends that law enforcement obtained these wiretaps in violation of 18 U.S.C. § 2518.

Federal telephone wiretapping is governed by Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III"). Title III prohibits, *inter alia*, unauthorized interception of wire and electronic communications of private parties. It

---

[3] The Court has carefully considered Defendant's *pro se* filings, the cases they cite, and the arguments advanced therein.

13

governs the procedures that law enforcement must abide by to obtain a warrant for a wiretap. Defendant argues that the Title III intercept should be suppressed because the Government did not meet Title III's necessity requirement. He has also advanced an argument, filed *pro se*, that the wiretap is illegitimate because a new intercept on his telephone could not be tacked onto an application for an extension of the existing wiretap on Adair's telephone.

### 1. Did the Government meet Title III's necessity requirement?

Defendant first argues (through counsel and *pro se*) that the Government failed to meet Title III's "necessity requirement" in its wiretap application. The necessity requirement refers to 18 U.S.C. § 2518(3)(c)'s requirement that an authorizing judge find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" before authorizing a wiretap. "The purpose of the necessity requirement is 'to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications.'" *United States v. Bailey*, 840 F.3d 99, 114 (3d Cir. 2016), *cert. denied sub nom. Davis v. United States*, 137 S. Ct. 839 (2017) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). The Third Circuit has noted that the government need not "exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997). Instead, "[t]he government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient." *Id.* (internal quotation marks omitted). "The Government's burden is minimal . . . ." *United States v. Heilman*, 377 F. App'x 157, 175 (3d Cir. 2010). Moreover, the Court "appl[ies] the necessity requirement 'in a practical and common sense fashion.'" *Bailey*, 840 F.3d at 114 (quoting *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975)).

14

In evaluating necessity concerning the investigation of a conspiracy, the Court considers the application in light of the "specific goals pursued by the investigation at hand." *United States v. Ellis*, 693 F. App'x 137, 139 (3d Cir. 2011). This is so because the individuals to be intercepted are alleged members of the conspiracy, and investigative techniques that may be effective as to an individual member may foil the investigation of the larger scheme. *See Bailey*, 840 F.3d at 114–15 (upholding intercepts of the leader of a drug-trafficking organization in part because "arresting [him] alone would have frustrated the goals of the broader investigation"). In *Bailey*, the Third Circuit also considered whether "other, less invasive investigative techniques would also fail to reveal the full scope of the [conspiracy's] operations." *Id.*

Defendant argues that *Ellis* is inapposite because there, the government had made factual showings that, among other things, confidential informants were fearful of the conspiracy's (Pittsburgh's East Hills Bloods) "violent, retaliatory code," that individuals who were arrested failed to provide useful information, and that law enforcement would have difficulty infiltrating the close-knit gang, whose members had all grown up together. (ECF No. 517, ¶ 9 (quoting *Ellis*, 693 F. App'x at 140).). By contrast, Defendant avers, the Government here did not lay the groundwork to show that ordinary investigative techniques would not suffice. Because the Government's initial focus was on Adair, Defendant faults it for not attempting available investigative techniques as to Richardson before seeking the wiretap.

For its part, the Government contends that the affidavits were more than sufficient because the goal of the investigation was to identify and dismantle a conspiracy that potentially included "collusive physicians." (ECF No. 584 at 13 (quoting ECF No. 517–1, at 56).) It says that SA Werner's descriptions of failed or likely unsuccessful or dangerous investigative procedures were adequate and informed by Werner's twenty (20) years of FBI experience. Further, the Government

15

rejects the notion that law enforcement must exhaust other investigative techniques before resorting to wiretaps. The Court will address these arguments in turn.

SA Werner's affidavit identified that "[t]he goal of this investigation is to identify all persons participating in a prescription drug diversion conspiracy involving RICHARDSON and ADAIR, determine the precise manner in which the conspiracy operates, and to dismantle the criminal organization through arrests and prosecutions of ADAIR, RICHARDSON, and other involved conspirators both inside and outside the Western District of Pennsylvania." (ECF No. 517–1, at 55–56.) It set forth that the conspiracy "may include sources of supply for ADAIR and RICHARDSON, and possibly collusive physicians responsible for writing prescriptions for the pills being obtained and illegally distributed by members of the conspiracy." (*Id.* at 56.)

SA Werner then described other investigative procedures that had been tried and failed, appeared unlikely to succeed, were too dangerous, or risked exposing the then-covert investigation. These included:

1. Pen register and telephone toll records, which law enforcement used extensively but that Werner attested could not identify the parties to conversations or their substance (*id.* at 63–64);

2. Physical and electronic surveillance, which had limited success due to the scope of the alleged conspiracy, the suspects' erratic schedules, and the length of time required to observe the entire "chain of suspected activity" (*id.* at 65);

3. Confidential sources, who provided useful information to initiate the inveistigation but woud be unlikely to successfully identify the scope of conspiracy or "the nature and types of conversations and agreement ADAIR and RICHARDSON are having with the large number of individuals they deal with on a daily basis." (*Id.* at 71.) Additionally,

Werner warned that the confidential informants could reveal the investigation to the target subjects, which would significantly hamper the investigation. (*Id.* at 72.)

Werner also identified several more tactics which law enforcement had not tried because they were likely to alert a subject of the investigation and cause the targets to change their activities or discontinue the use of cell phones that were the subject of pen registers—namely, grand jury subpoenas (*id.* at 73); interviews of subjects or associates (*id.* at 74); and physical search warrants (*id.* at 75). Werner also attested that law enforcement had not used trash pulls because "very little if any evidence" related to purchasing or selling prescription narcotics would be gleaned from household trash. (*Id.* at 75–76.)

Defendant, proceeding through counsel and *pro se*, finds these explanations lacking for several reasons, each of which the Court will address. First, he avers that the Government made no factual showing that it was necessary to intercept Richardson's calls when Adair was the primary subject of the investigative techniques outlined in Werner's affidavit. (ECF No. 517, ¶ 12; ECF No. 570, at 3–4.) As a factual matter, Werner did note the specific need as to Richardson throughout the affidavit's necessity section. (*See, e.g.*, ECF No. 517-1, at 60 ("[T]he initiation of interception of calls from TARGET TELEPHONE 2 [Richardson's phone] will allow investigators to better determine both the sources of supply which ADAIR obtains and distributes to RICHARDSON, and what RICHARDSON does with that supply once he receives it from ADAIR."); *id.* at 64 (noting that while pen register has alerted investigators that Defendant was contacting other subjects, a wiretap "could provide evidence of the amount of pills being obtained and sold, agreed upon cost of the pills, and the full identities of individuals involved in the criminal conspiracy"); *id.* at 68 (noting that the DEA had begun pole camera surveillance outside

17

Defendant's home but this would not provide the nature of the conversations between Richardson and his visitors).)

Combined with the averred inadequacy of specific tools directed to Richardson, the potentially chilling effects that some techniques (such as grand jury subpoenas or individual arrests) would have on observable conspiratorial activity adequately demonstrated why a wiretap was necessary. *See Ellis*, 693 F. App'x at 140–41. And as will be explained below, it does not follow from the affidavit's similar showings of probable cause and necessity as to Richardson and Adair that the evidence was insufficient when considered distinctly as to each target subject.

Second, Defendant finds fault with SA Werner's failure to detail that ordinary investigative techniques had not or would not work. The Court does not agree. Reviewing the affidavit, Werner detailed why each of those avenues would be ineffective, due to the nature of the crime and the potential scope of the conspiracy. "We do not require law enforcement to prove that a certain investigative approach is useless to pursue a wiretap; it is only obligated to give a full explanation as to why a technique is 'impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues.'" *Heilman*, 377 F. App'x at 187 (3d Cir. 2010) (quoting *United States v. Vento,* 533 F.2d 838, 849 (3d Cir. 1976)).

2. Did the Government improperly include an application for a new intercept together with an application for an existing wiretap?

Proceeding *pro se*, Defendant also advances the argument that SA Werner improperly included an application for a new intercept on Defendant's telephone in the same application for an extension of an existing wiretap on Adair's telephone. (ECF No. 556.) Defendant is correct that each application must "stand alone," ECF No. 616–1, at 3. But the requirement that each application be, on its own, sufficient under § 2518 does not mean that each application must be presented in a separate physical document. Defendant has not brought to the Court's attention, nor

18

has the Court identified, any precedent indicating that an application for an extension of an existing intercept and an application for a new intercept cannot be included in the same application. *Cf. United States v. Rodrigues*, 850 F.3d 1, 4 (1st Cir. 2017) (discussing, without suggesting that they were unlawful, two applications in which the government sought authorization for a new intercept as well as the continued interception of other telephones, and holding that the government's affidavits were adequate). Nor, contrary to Defendant's contentions, does § 2518 require that each application be made separately. *See* 18 U.S.C. § 2518.

Defendant correctly points out that *United States v. Giordano* states that, "[u]nder § 2518, extension orders do not stand on the same footing as original authorizations but are provided for separately." 416 U.S. 505, 530 (1974). (ECF No. 556, at 36.) But that statement was a topic sentence for a paragraph quoting § 2518(5), the Title III provision governing extension orders, and explaining that when considering a wiretap extension application, "the court is required to make the same findings that are required in connection with the original order," that is, probable cause. *Giordano*, 416 U.S. at 530. A wiretap extension application must also include a "statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to explain such results." 18 U.S.C. § 2518(1)(f).

Although the adequacy of the affidavit in support of the wiretap extension as to Adair is not before the Court, the Court sees no infirmity in the extension application that would call into question the communications intercepted by the Adair wiretap that Werner then used to substantiate the application as to Richardson. Thus, *Giordano*, where the Supreme Court held that communications from one improper wiretap could not be used to justify another wiretap, 416 U.S. at 532, is inapposite.[4]

---

[4] In *Giordano*, the Supreme Court also held that if the communications from the improper wiretap not been included in the application, "no extension order at all could have been granted" because they were the only basis for probable

19

Related to his necessity argument, Defendant also avers that because the wiretap extension as to Adair allegedly insufficiently established necessity, the Government improperly bootstrapped that application to establish necessity as to Richardson. The Court disagrees. As detailed above, SA Werner made specific assertions as to Richardson to support the necessity of the new wiretap. And where, as here, law enforcement is investigating a conspiracy, there may be some permissible overlap of the evidence establishing necessity for multiple targets. *See Heilman*, 377 F. App'x at 190 (stating that "[Defendant 1] suggests that the investigation of [Defendant 1] and [Defendant 2] were distinct, by suggesting that the investigation of [Defendant 2] was somehow not an investigation of him as well, but this is not the case" and holding that "the wiretap application for [Defendant 1]'s phone established necessity, even though much of the evidence referenced to establish necessity was also referenced in the wiretap application for [Defendant 2]'s second phone").

Additionally, that the Government used facts from its investigation of Adair to support an application to intercept Richardson's phone does not render the wiretap *ultra vires*. The affidavit in support of the applications makes clear that agents investigated Richardson, Adair, and many other individuals as part of a larger investigation of a conspiracy to distribute opioids. (*See, e.g.*, ECF No. 517–1, at 3.) The affidavit sets forth facts supporting probable cause for the continued interception of Adair's telephone (*id.* at 27–47), and in a separate section sets forth facts supporting probable cause for the initial interception of Richardson's telephone (*id.* at 47–81). Even without the section specifically pertaining to Adair only, the Court concludes that the facts specific to Richardson were sufficient to establish probable cause as to the Richardson intercept. (*See, e.g.*, *id.* at 48–49 (providing a transcript of a conversation intercepted from Adair's telephone between

---

cause. 416 U.S. at 532. Here, SA Werner also relied on video from the pole camera and information provided by confidential sources in order to show probable cause. (ECF No. 517–1, at 64–70.)

Adair and Richardson, in which Adair told Richardson she was "just getting in some, um, 15s. Perc 15s," Richardson asked, "for how much?" Adair responded "they were only like $12 or something. . . . I only got 30 of em" and Richardson told her "I need fucking producers. This [other] bitch [who had given him 'a whole bunch of 30s'] is like clockwork").) For this reason, the Court also does not find merit in Defendant's argument that the affidavit improperly used "mere boilerplated language," ECF No. 616–1, at 7.

Moreover, sections of the affidavit in support of a continuing intercept of Adair's telephone specifically referred to conversations with Richardson. (*See, e.g.*, *id.* at 39 (detailing text messages between Adair's telephone and Richardson's telephone that SA Werner believed were Richardson asking Adair to procure more pills).)

On these facts, the Court cannot conclude that it was improper for the Government to include both applications in one document, or that the affidavit lacked a sufficient showing of necessity or probable cause as to Richardson. *Cf. Heilman*, 377 F. App'x at 190 (upholding an affidavit's necessity showing when "the wiretap affidavits for [Defendant 1]'s second phone and [Defendant 2]'s phone are virtually the same").[5]

## F. Pro-Se Supplement to Appeal of Detention Order

Defendant, proceeding *pro se*, also asks the Court to vacate the order authorizing his pretrial detention and to hold a new hearing on the issue. (ECF No. 557.) At the August 8, 2018 Motions Hearing, Defendant stated that he was not pursuing the detention issues at that time due to the close proximity of the trial date. The Court will nonetheless address his Motion at ECF No. 557.

---

[5] Defendant filed a pro se Motion to Compel the Court to Address the Criminally Manufactured Allegations of the AUSA, ECF No. 588. Because its allegations mirror and overlap with other allegations made relative to the 2014 and 2016 searches, and as to the wiretap application, that Motion is likewise denied.

In support of his motion, Defendant advances many of the arguments addressed above—that law enforcement fabricated or obtained illegally any evidence against him, and that no evidence implicates him in the commission of a crime. The Government has already responded at ECF No. 413 to Defendant's previous *pro se M*otion to Revoke Order of Detention, ECF No. 403. There, the Government detailed Defendant's violent actions, including threats against a Pittsburgh Police officer, ongoing drug dealing, and extensive criminal history. Upon review of Defendant's filings at ECF No. 557, the Court agrees with Magistrate Judge Kelly's determination that Richardson be detained, as the Government has demonstrated with more than sufficient record evidence, by the requisite evidentiary standard, that there are no conditions, or combinations of conditions, that would "reasonably assure the appearance of the person" and the "safety of the community." *See* 18 U.S.C. § 3142(e)(3). Defendant has not rebutted this evidence. His Motion will be denied.

### III. Conclusion

For the reasons stated in this Opinion, Defendant William Richardson's Motions at ECF Nos. 513, 515, 516, 531, 539, and 558 will be denied without prejudice. Defendant's Motions at ECF Nos. 511, 517, 531, 544, 556, 557, 560, and 588 will be denied with prejudice.

An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: August __, 2018

cc:     All counsel of record

22